837 P.2d 1212

**SALT RIVER PROJECT,
Petitioner–Employer,**

**Salt River Project c/o Sedgwick James
of Arizona, Inc., Petitioner–Carrier,**

v.

**The INDUSTRIAL COMMISSION
OF ARIZONA, Respondent,**

**Robert CLINE, Respondent Employee,**

**Industrial Commission of Arizona–
Special Fund, Respondent.**

**No. 1 CA–IC 91–0082.**

Court of Appeals of Arizona,
Division 1, Department E.

Sept. 15, 1992.

478

Jennings, Strouss & Salmon by Ronald H. Moore, Phoenix, for petitioner.

Anita R. Valainis, Chief Counsel, Industrial Com'n of Arizona, Phoenix, for respondent.

Industrial Com'n of Arizona–Special Fund by Kent M. Struckmeyer, Phoenix, for respondent.

OPINION

VOSS, Presiding Judge.

This is a special action review of an Arizona Industrial Commission ("commission") award denying apportionment under the second injury fund statute. *See* Ariz. Rev.Stat.Ann. ("A.R.S.") § 23–1065(C) (Supp.1991). We address one issue: whether a brain tumor (meningioma) is a "[c]erebral vascular accident," one of the listed impairments under subsection 23–1065(C). *See* A.R.S. § 23–1065(C)(3)(k). The Administrative Law Judge ("A.L.J.") concluded that this phrase refers to a stroke. We agree and accordingly affirm the award denying apportionment for a meningioma.

In August 1986, while working as a welder for the self-insured petitioner employer ("SRP"), respondent employee ("claimant") injured his neck. SRP accepted compensability.

In October 1986, claimant underwent neck surgery for the industrial injury. He did return to work, but new diagnostic testing because of ongoing symptoms revealed a previously undiagnosed meningioma.[1] In October 1987, claimant underwent

1. SRP presented evidence that Claimant had suffered undiagnosed symptoms of the meningioma since the 1970s, including loss of sense of smell and gradual personality changes, and that Claimant had been demoted in 1986 from a supervisor to an hourly worker as a result of these personality changes. The A.L.J. accepted this evidence but found that SRP failed to prove that the preexisting impairment rated at least ten percent at the time of injury as required by section 23–1065(C). SRP disputes this interpretation, asserting that section 23–1065(C) is satisfied if the preexisting impairment rated ten percent when the industrial injury became station-

brain surgery for the meningioma. Neuropsychological testing after the surgery established a permanent impairment of at least ten percent as a result of the meningioma and surgery.

In November 1988, claimant ended his employment with SRP. In March 1989, the industrial injury became stationary with an unscheduled permanent impairment. The commission subsequently issued an award for permanent partial disability, *see generally* A.R.S. § 23–1047, which SRP protested. It also notified the commission ("Special Fund") of its intention to claim apportionment under section 23–1065(C). *See generally* A.R.S. § 23–1065(D). SRP and claimant, with the Special Fund's consent and the commission's approval, ultimately settled their dispute. This agreement expressly preserved SRP's right to pursue its claim to apportionment under section 23–1065(C).

Hearings ensued on the apportionment question. Among the witnesses were two neurologists, Michael Epstein, M.D., and Charles L. Echols, Jr., M.D. Dr. Epstein defined a meningioma as a benign tumor in the connective tissue that envelopes the brain. Both experts agreed that claimant's tumor was long-standing, had grown from underneath the brain into the frontal lobes, was vascular[2], and was an unforeseen occurrence.

Both experts also testified about the medical definition of "cerebral vascular accident." Dr. Epstein stated that "cerebral vascular accident … means stroke, it doesn't mean tumor." In his opinion, this phrase is outmoded because the risk factors for stroke are now known and therefore a stroke is no longer described as accidental. On cross-examination, Dr. Epstein testified that while "cerebral vascular" and "cerebrovascular" are synonymous in medical parlance, the terms "cerebral," "vascular," and "accident" have ordinary nonmedical meanings as well as medical meanings and that several of the listed impairments employ nonmedical terms. But, Dr. Epstein bluntly discredited SRP's suggested ordinary meaning definition of "cerebral vascular accident" as any unforeseen occurrence involving blood vessels of the cerebrum as a "perversion" of language:

No. I mean that is like spelling first P-h-i-r-s-t, and taking the "gh" from enough, and the "ti" from nation. There's a perversion of words. A cerebral vascular accident is a stroke. A tumor is not a stroke. [T]here is no equation here. It's a perversion of the language which you're enjoying, and it's garbage. No doctor will equate the two. No one will stop laughing after they leave the room.

*Id.* Dr. Echols testified that "cerebral vascular accident" is medically defined to mean "a normally occurring blood vessel that's caused a thrombosis or spontaneous rupture. I've never heard it used in the context of a tumor."

After the hearings, the parties submitted legal memoranda. The A.L.J. then issued the award denying apportionment. The critical findings concerning the classification of a meningioma are as follows:

7. According to A.R.S. § 23–1065 C3 [sic], pre-existing impairment to cause apportionment must consist of one of listed diseases or conditions set forth therein. The employer has taken the position that meningioma is equivalent to cerebral vascular accident as it involves all three words when used in lay sense without describing an illness. It is deemed that intent of language "cerebral vascular accident" was to describe a stroke. That a meningioma takes place

---

ary with an unscheduled impairment. We do not address this issue because even if SRP is correct, it also must establish that a meningioma is a listed impairment under section 23–1065(C)(3). The remainder of this opinion addresses and rejects SRP's arguments that a meningioma is a listed impairment.

2. Dr. Echols explained that tumors are live tissue and accordingly have a blood supply. The adjective "vascular" is a relative term that means that the tumor was very vascular. (*Id.* at 45–46.)

in cerebrum, involves vascular tissue and is an accident, does not, in the undersigned's opinion, mean impairment from a brain tumor to be considered as intent of the statute [sic]. If legislature desired impairment from brain tumor to constitute grounds for apportionment, they [sic] could have used such language.

8. Based primarily on fact that a meningioma is not considered to be the same as a cerebral vascular accident which admittedly was medically used to describe a stroke, it is deemed apportionment should not take place in the instant case. .

The A.L.J. affirmed the award on administrative review. SRP responded by timely bringing this special action.

On review, SRP asserts that a meningioma is a "[c]erebral vascular accident" within the meaning of A.R.S. section 23–

1065(C)(3)(k) because the impairments listed in section 23–1065(C)(3) are "general conditions, descriptive of different specific medical diagnoses or etiological agents," rather than "specific medical [sic] diagnosed conditions...." The Special Fund answers by arguing that section 23–1065(C)(3)(k) refers only to strokes.

In 1986, the legislature substantially amended A.R.S. § 23–1065. *See* 1986 Ariz. Sess.Laws Ch. 172, § 2 (retroactively applicable to Jan. 1, 1986). Subsection (C)[3] is adapted from the Model Workmen's Compensation and Rehabilitation Law. *See* Model Workmen's Compensation and Rehabilitation Law (Revised) § 20 (The Council of State Governments 1963) ("Model Act") *reprinted in* 4 Arthur Larson, *The Law of Workmen's Compensation,* at 631, 670–72 (1990).[4]

Both subsection 23–1065(C) and section 20 of the Model Act restrict apportionment

3. Subsection 23–1065(C) provides:

In claims involving an employee who has a preexisting physical impairment which is not industrially-related and, whether congenital or due to injury or disease, is of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed, and the impairment equals or exceeds a ten per cent permanent impairment evaluated in accordance with the American medical association guides to the evaluation of permanent impairment, and the employee thereafter suffers an additional permanent impairment not of the type specified in § 23–1044, subsection B, the claim involving the subsequent impairment is eligible for reimbursement, as provided by subsection D of this section, under the following conditions:

1. The employer in whose employ the subsequent impairment occurred or its carrier is solely responsible for all temporary disability compensation to which the employee is entitled.

2. The employer establishes by written records that the employer had knowledge of the permanent impairment at the time the employee was hired, or that the employee continued in employment after the employer acquired such knowledge.

3. The employee's preexisting impairment is due to one or more of the following:

(a) Epilepsy.
(b) Diabetes.
(c) Cardiac disease.
(d) Arthritis.
(e) Amputated foot, leg, arm or hand.

(f) Loss of sight of one or both eyes or a partial loss of uncorrected vision of more than seventy-five per cent bilaterally.
(g) Residual disability from poliomyelitis.
(h) Cerebral palsy.
(i) Multiple sclerosis.
(j) Parkinson's disease.
(k) Cerebral vascular accident.
(*l*) Tuberculosis.
(m) Silicosis.
(n) Psychoneurotic disability following treatment in a recognized medical or mental institution.
(*o*) Hemophilia.
(p) Chronic osteomyelitis.
(q) Hyperinsulism. [sic]
(r) Muscular dystrophies.
(s) Arteriosclerosis.
(t) Thrombophlebitis.
(u) Varicose veins.
(v) Heavy metal poisoning.
(w) Ionizing radiation injury.
(x) Compressed air sequelae.
(y) Ruptured intervertebral disk.

4. The employer or carrier and the special fund are equally responsible for the amount of compensation for loss of earning capacity under § 23–1044, subsection C or permanent total disability under § 23–1045, subsection B.

4. Section 20 provides:

(a) If an employee who has a permanent impairment from any cause or origin incurs a subsequent impairment by injury arising out of and in the course of his employment resulting in compensation liability for disability that is substantially greater by reason of the combined effects of the preexisting impair-

to listed preexisting impairments.[5] The Model Act also includes a catchall provision permitting apportionment for unlisted impairments causing a specified degree of disability. *See* Model Act, section 20(d) ("No condition shall be considered a 'permanent impairment' unless it is one of the following [listed] conditions ... *or unless it would support a rating of disability of 200 weeks or more if evaluated according to standards applied in compensation claims.*") (emphasis added). Subsection 23–1065(C) conspicuously omits this catchall provision. *See* A.R.S. § 23–1065(C)(3) (permitting apportionment only if "[t]he employee's preexisting impairment is due to one or more of the following [listed impairments]....").

According to Larson, the listed impairments in section 20 of the Model Act were

> ment and subsequent injury or by reason of the aggravation of the preexisting impairment than that which would have resulted from the subsequent injury alone, the employer or his insurance carrier shall in the first instance pay all awards of compensation provided by this act, but such employer or his insurance carrier shall be reimbursed from the Special Fund created by Section 55 for all compensation payments subsequent to those payable for the first 104 weeks of disability.
>
> (b) If the subsequent injury of such an employee shall result in the death of the employee and it shall be determined that the death would not have occurred except for such preexisting permanent impairment, the employer or his insurance carrier shall in the first instance pay the compensation prescribed by this act, but he or his insurance carrier shall be reimbursed from the Special Fund created by Section 55 for all compensation payable in excess of 104 weeks.
>
> (c) In order to qualify under this section for reimbursement from the Special Fund, the employer must establish by written records that the employer had knowledge of the permanent impairment at the time that the employee was hired, or at the time the employee was retained in employment after the employer acquired such knowledge.
>
> (d) As used in this section, "permanent impairment" means any permanent condition, whether congenital or due to injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining reemployment if the employee should become unemployed. No condition shall be considered a "permanent impairment" unless it is one of the following conditions:

intended "to remove completely from controversy a number of the commonest prior impairments...." 2 Arthur Larson, *supra*, § 59.32(e) at 10–492.474 to .475 (1992). The listed impairments, therefore, are specific impairments, not general categories of impairments. All unlisted impairments fall under the catchall provision of the Model Act. *Id.* at 492.475 to .477.

■ The question arising from this comparison is whether by deleting the catchall provision from section 23–1065(C)(3), the legislature intended to restrict apportionment to the listed impairments or to transform the Model Act's list of specific impairments into general categories of impairments. In our opinion, the legislature more probably intended to restrict apportionment to the listed specific impairments.

> (1) Epilepsy
> (2) Diabetes
> (3) Cardiac disease
> (4) Arthritis
> (5) Amputated foot, leg, arm or hand
> (6) Loss of sight of one or both eyes or a partial loss of uncorrected vision of more than 75 percent bilaterally
> (7) Residual disability from poliomyelitis
> (8) Cerebral palsy
> (9) Multiple sclerosis
> (10) Parkinson's disease
> (11) Cerebral vascular accident
> (12) Tuberculosis
> (13) Silicosis
> (14) Psychoneurotic disability following treatment in a recognized medical or mental institution
> (15) Hemophilia
> (16) Chronic osteomyelitis
> (17) Ankylosis of joints
> (18) Hyperinsulism [sic]
> (19) Muscular dystrophies
> (20) Arteriosclerosis
> (21) Thrombophlebitis
> (22) Varicose veins
> (23) Heavy metal poisoning
> (24) Ionizing radiation injury
> (25) Compressed air sequelae
> (26) Ruptured intervertebral disk
> or unless it would support a rating of disability of 200 weeks or more if evaluated according to standards supplied in compensation claims.

5. The lists are identical except that section 20 also lists "Ankylosis of joints." *See* Model Act § 20(d)(17).

If the legislature had intended to extend apportionment to other impairments, it would have retained the Model Act's catch-all provision or a modified version of it.

SRP nevertheless argues that subsection 23–1065(C)(3)(k) includes a meningioma because the phrase "[c]erebral vascular accident" is undefined and the terms "cerebral," "vascular," and "accident" have ordinary meanings that apply to a meningioma. We disagree.

■ Statutory language normally has its ordinary meaning. A.R.S. § 1–213. This generalization does not apply if language is used in a technical sense. *Id.* This exception applies to the interpretation of subsection 23–1065(C)(3), which lists impairments, and the term "impairment" has a technical meaning in workers' compensation law. *See Smith v. Industrial Comm'n*, 113 Ariz. 304, 305 n. 1, 552 P.2d 1198, 1199 n. 1 (1976) (adopting definition of "permanent impairment" in AMA Guides). The AMA Guides define "permanent impairment" as "a purely medical condition...." *Id.*

■ Among the purely medical conditions listed in subsection 23–1065(C)(3) is a "[c]erebral vascular accident." A.R.S. § 23–1065(C)(3)(k). The medical experts who testified in the present case unanimously defined this phrase to refer exclusively to a stroke. If the statutory language has its intended technical meaning, it cannot apply to a meningioma.[6]

■ SRP lastly argues that this technical definition of "cerebral vascular accident" defeats the remedial purpose of a second injury apportionment statute. We agree that the purpose of subsection 23–1065(C) is to encourage employers to hire handicapped workers by protecting such employers from the burden of increased compensation liability resulting from the combination of preexisting impairments and industrial injuries. *See Window Rock School Dist. # 8 v. Industrial Comm'n*, 26 Ariz.App. 14, 16, 545 P.2d 976, 978 (1976). But the court in *Window Rock* rejected the argument that the court should ignore language in the predecessor statute in order to provide a more comprehensive second injury fund remedy than the legislature had provided. *Id.*

We also reject SRP's invitation to interpret the current second injury fund statute in a manner that is at best unheard-of and at worst a perversion of the phrase "cerebral vascular accident." SRP's remedy is by legislation, not by judicial intervention.

The A.L.J. correctly interpreted subpart (k) of subsection 23–1065(C)(3) to refer exclusively to strokes. SRP concedes that a meningioma is not a stroke and that no other listed impairment includes a meningioma. We accordingly affirm the award denying apportionment for this reason alone.

CLABORNE and EUBANK, JJ., concur.

---

**6.** Even if "cerebral vascular accident" were defined according to the ordinary meaning of the three terms of the phrase, we question whether the phrase applies to a meningioma. A meningioma is an unforeseen growth in the tissue enveloping the brain and a meningioma is vascular, but vascularization in a meningioma is not unforeseen because all living tissue is supplied with blood through vessels. The phrase applies to a vascular accident in the brain, not to an unforeseen development of tissue in the brain.