891 P.2d 902

SCHUFF STEEL COMPANY,
Petitioner Employer,

Argonaut Insurance Company,
Petitioner Carrier,

v.

The INDUSTRIAL COMMISSION
OF ARIZONA, Respondent,

Duncan Hancock, Respondent Employee,

SPECIAL FUND DIVISION, Respondent
Party in Interest.

No. 1 CA–IC 92–0183.

Court of Appeals of Arizona,
Division 1, Department B.

Aug. 18, 1994.

Reconsideration Denied Dec. 5, 1994.

Review Denied March 21, 1995.

Steven C. Lester, Phoenix, for petitioner employer and petitioner carrier.

Anita R. Valainis, Chief Counsel, Phoenix, Indus. Com'n of Arizona, Phoenix, for respondent.

Laura L. McGrory, Indus. Com'n of Arizona, Phoenix, for respondent party in interest.

OPINION

CONTRERAS, Judge.

This is a special action review of an Arizona Industrial Commission ("Commission")[1] Decision Upon Review ("Decision") denying apportionment of permanent partial disability compensation under Ariz.Rev.Stat.Ann. ("A.R.S.") subsection 23–1065(C) (Supp.1993). The Administrative Law Judge ("ALJ") denied apportionment because although cervical arthritis and either bilateral hand arthritis or occipital neuralgia are preexisting nonindustrial physical impairments rating 10% or more under the AMA Guides, the written record requirement was not satisfied as to the bilateral hand arthritis. In addition, the ALJ determined the evidence failed to establish that the cervical arthritis probably caused the occipital neuralgia and failed to establish that the occipital neuralgia is permanent.

Petitioner Carrier ("Argonaut") presents three issues. First, whether subsection 23–1065(C), which restricts apportionment to qualified nonindustrial impairments, unconstitutionally denies employers of industrially handicapped workers equal protection of the law. Second, whether the written records requirement of subpart (2) of subsection 23–1065(C) separately applies to each component impairment of the required 10% permanent impairment when each has the same enumerated cause, e.g., arthritis. Third, whether the ALJ disregarded what Argonaut argues was the only reasonable inference from the record by concluding that Argonaut failed to prove to a reasonable medical probability that the cervical arthritis caused occipital

neuralgia and that this complication is permanent. For the following reasons, we affirm the Decision.

## A. Factual and Procedural History

### 1. Pre-injury Vocational and Medical History

Claimant, who was born in 1927, has been an ironworker his entire working life. He had a thirty-year employment relationship with David Schuff, the owner of Petitioner Employer ("Schuff Steel"), who considered Claimant both an exceptional employee and a friend. The owner characterized Claimant as "the toughest man that has ever lived" and as "the greatest leader and motivator I've ever been around."

Throughout his years in this high risk trade, Claimant suffered numerous industrial injuries. These include: (1) 1956 amputation of first and second fingers of left hand; (2) 1962 compression fracture of vertebrae at L1–2; (3) 1966 crush injury of right foot; (4) 1970 fracture of left elbow; (5) 1974 blow to head; (6) 1980 fracture of left arm and subsequent reopening for a torn meniscus in right knee; and (7) 1982 amputation of tip of index and long finger of right hand.

#### a. Preexisting Headaches

Claimant complained of headaches since the 1962 injury. From 1962 to 1974 these headaches occurred every couple of months and subsided with aspirin. After the 1974 head injury, however, Claimant complained of severe daily headaches. His symptoms included nausea, blurred vision, and increased hearing loss.[2] Aspirin no longer was effective, and Claimant took narcotic medication for relief. He also designed a traction device and administered hot packs and massage.

Claimant's treating physician, Dr. Vernetti, referred him to a neurologist, Richard A.

---

1. Although the Commission generally lacks standing to appear as an advocate, it has standing in this case to defend the integrity of the Special Fund. *See Evertsen v. Industrial Comm'n,* 117 Ariz. 378, 382, 573 P.2d 69, 73 (App.1977), *approved and adopted,* 117 Ariz. 342, 572 P.2d 804 (1977). Respondent employee is a party to this special action, but he has not actively

ly participated because the apportionment dispute is between the employer's carrier and the Special Fund Division of the Commission.

2. According to Claimant, exposure to loud noises at work had caused some hearing loss.

Thompson, M.D., in September 1974. Dr. Thompson reported receiving a history from Claimant of numerous head and neck injuries, among many others. Dr. Thompson then stated that

> [t]he only important sequelae of this [history] is recurring neck pain and occipital headache, either unilateral or bilateral, often radiating into the frontal regions, sometimes into the area of the eye. Most of the pain he describes is consistent with ... cervical arthritis and occipital neuralgia, but some of the headaches probably are ... migrainous in nature, most likely being initiated by the occipital pain and tenderness.
>
> ....
>
> It is my impression this patient has traumatic ˙cervical arthritis and musculoskeletal pain resulting from this. Some of the pain radiates over the occipital nerves, and therefore, qualifies for the diagnosis of occipital neuralgia. Severe pain of this type sometimes produces migraine reaction, which he has had on occasion.

In April 1976, neurosurgeon John J. Kelley independently examined Claimant for the carrier. Dr. Kelley diagnosed "tension vascular headaches" that "appear to be of a muscle tension variety and may have secondary occipital neuralgia component" and "appear to stem from the injury of 7–18–74." He, however, reviewed x-rays taken in July 1974 after the industrial injury, reported that the cervical spine films were normal, and recommended repeat cervical x-rays. A radiologist subsequently reported that the repeat x-rays revealed *"[e]ssentially normal appearance of the cervical spine structures. There is no traumatic injury, fracture, dislocation or disc disease.* Slight spurring is seen at the inferior end plate of C5."

Two months later, the carrier referred Claimant for another independent medical examination. Despite Claimant's history of unrelieved headaches and related symptoms, the group concluded that the July 1974 injury was stationary without permanent impairment. Relying on this report, the carrier terminated the claim. Claimant requested a hearing and retained a workers' compensation specialist to represent him.

In December 1976, Claimant saw an associate of Dr. Thompson, neurologist Betty F. Ball, M.D. In the reported history, Dr. Ball noted that cervical spine films taken at the time of the July 1974 injury showed no apparent abnormalities. Her only positive physical findings were paracervical muscle spasm and tenderness to palpation over the occipital areas and cervical spine. She nevertheless concluded that Claimant's

> history and examination is believed consistent with a diagnosis of cervical arthritis with resultant cervical muscle spasm, resulting in ... muscle contraction headaches. There is a suggestion of [a] component of vascular headache, as well as perhaps [a] *complicating feature of occipital neuralgia* with the above pain syndrome.

Dr. Ball recommended medication to treat the occipital neuralgia but could not offer any treatment for the "muscle spasm and complaints secondary to cervical arthritis" beyond what Claimant already had received.

A hearing ensued, but the transcript is not part of the current record. ALJ Galloway subsequently issued an award terminating the July 1974 claim without permanent impairment. His findings note that Dr. Ball "testified that ... [Claimant] was having muscle contraction headaches but did not prescribe any treatment for the headaches and while the headaches may have been aggravated by the industrial injury Doctor Ball could not state that there was a permanent disability."

### b. Preexisting Hand and Arm Problems

The 1956 amputations affected Claimant's ability to grasp objects with his left hand. The 1970 left elbow fracture affected his ability to rotate his left arm. According to Claimant, after the 1980 left arm fracture, he had new symptoms such as his right hand locking on the steering wheel of his car after driving to work and swelling after using tools at work.

### 2. 1989 Industrial Injury

On June 9, 1989, Claimant fell at work and injured his right shoulder, left arm, and left ankle. According to Claimant, his inability

to grasp and carry objects caused this fall. After surgery for a torn rotator cuff and treatment for wrist and ankle fractures, Claimant had residual physical impairments of 7% of the right shoulder, 5% of the left wrist, and 5% of the left ankle. His treating physician concluded that these physical impairments prevented Claimant from working as an ironworker.

Argonaut subsequently closed the claim with permanent physical impairment and notified the Special Fund of its intent to claim apportionment under subsection 23–1065(C). The claim proceeded to the Commission for its assessment of earning capacity. *See generally* A.R.S. § 23–1047 (1983). Claimant responded to the Commission's request for information by, among other things, listing "[p]rior [d]isabilities," including "[a]rthritis and [t]endonitis in [b]oth [h]ands." The Commission subsequently prepared an internal memorandum regarding loss of earning capacity, which reiterated Claimant's list of prior physical impairments.[3]

On June 26, 1991, the Commission issued its award for permanent partial disability compensation based upon Claimant's capacity to work as an order filler. This award also denied apportionment under subsection 23–1065(C). Argonaut protested this Award. A hearing was scheduled for October 25, 1991, and the Special Fund requested to be joined as a real-party-in-interest.

Pending the hearing, Argonaut and the Special Fund submitted multiple documents concerning many of Claimant's prior industrial injuries. Both also scheduled independent medical examinations with orthopedic surgeons, but neither party requested an examination by a neurologist or neurosurgeon.

On October 1, 1991, T.H. Taber, Jr., M.D., examined Claimant for the Special Fund. Dr. Taber examined Claimant's neck and left wrist and noted no swelling or crepitus in the latter. He also reviewed cervical x-rays and a CT scan from June 1989 and the reports of Drs. Thompson, Ball, and the group examiners concerning the 1974 injury and headache

symptoms. He concluded that Claimant had cervical arthritis that rated a 5% permanent whole person impairment, which preexisted the June 1989 industrial injury but this did not constitute a hindrance to employment. He, however, found nothing to indicate that Claimant had arthritis of the hands or wrists. After further review of medical records from the 1980 injury, Dr. Taber reported among other things that x-rays from February 1981 showed mild degenerative changes in the second and third MP joints of the right hand. This review, however, did not change the doctor's opinion.

On October 16, 1991, David A. Rand, M.D., examined Claimant for Argonaut. At the time Claimant complained of neck pain, headaches, and arm and hand pain. Dr. Rand noted that several of Claimant's doctors had commented that he has cervical arthritis and that a neurologist had commented that this arthritis caused cervical muscle spasm and contractions, which in turn caused the headaches. Dr. Rand also ordered x-rays of the cervical spine and both hands. These x-rays revealed degenerative changes at C4–5, C5–6 and C6–7, minimal degenerative changes in the left hand, and more than minimal degenerative changes in the right hand. He concluded that Claimant has osteoarthritis of the cervical spine and hands, which is unrelated to any of the industrial injuries and rated at least a 10% whole person impairment. He also concluded that Claimant probably has arthritis of the lumbosacral spine and that it is unrelated to the industrial injuries. Finally, Dr. Rand stated that Claimant's headaches prevented him from working as an ironworker.

At the initial hearing, Argonaut withdrew its protest of the Commission's loss of earning capacity determination. The only disputed issue was apportionment. At this and continued hearings, Claimant, the owner of Schuff Steel, a co-worker, and Drs. Rand and Taber appeared and testified.[4] We summarize their testimony.

---

3. Although part of the file, this memorandum was not sent to the parties.

4. Labor market consultants for Argonaut and the Special Fund also appeared, but their testimony is not relevant to this review.

Claimant testified that the headaches and other symptoms described in his 1976 hearing request continued to the present. Because of these symptoms and his age, he was fearful that he would not survive until he retired. The owner of Schuff Steel was aware of Claimant's headaches and of his fears. Claimant acknowledged, however, that by 1977, he had learned what triggered his headaches and how to manage them. By 1989 the headaches were controlled, and he no longer had nausea or dizziness. Furthermore, he never lost work time because of his headaches or other symptoms.

Claimant also testified that the treating physician for the 1980 injury, Dr. Katz, had told him that "tendinitis" caused his hand problems. Because of these problems, he needed help pulling ropes, carrying heavy equipment, and using tools. The owner of Schuff Steel was aware of these problems. Claimant, however, could not recall a prior diagnosis of arthritis and never told the owner of Schuff Steel that he had arthritis. He also acknowledged that he never missed work because of his hand problems.

The owner of Schuff Steel and a co-worker confirmed that they knew of Claimant's headaches and hand problems and that he needed assistance because of them. The owner explained that he had hired Claimant for his "brains" to work as a supervisor and willingly accommodated his limitations. He suspected that Claimant had arthritis of the hands but did not know what caused his headaches. He, however, was not aware of any written records concerning either condition.

Dr. Rand testified that he examined Claimant to determine if he had arthritis of the cervical spine or hands and to rate any resulting impairment. Regarding the hands, he testified that in addition to the degenerative changes revealed by x-ray, he found fusiform (diffuse) swelling, which he characterized as persistent and consistent with arthritis. In his opinion, the cervical arthritis rated a 6–7% whole person impairment and the bilateral hand arthritis rated about a 5% whole person impairment.

Dr. Rand also testified that Claimant's headaches are compatible with cervical arthritis as well as a variety of other causes. He did not express a causation opinion to a reasonable medical probability. He, however, did not disagree with Dr. Thompson's September 1974 report. Although he did not rate an impairment for occipital neuralgia, if he assumed that Claimant had the same symptoms now that he had when he saw Dr. Thompson, Dr. Rand testified that the occipital neuralgia definitely would rate an additional impairment, which he guessed would be about 5%. He, however, had not diagnosed occipital neuralgia, which may be related to cervical arthritis but is a distinct condition.

Dr. Taber agreed that Claimant has cervical arthritis, which in his opinion predated the June 1989 industrial injury by about five years. He admitted that he had not rated the resulting impairment in accordance with the AMA Guides. He also conceded that the cervical arthritis itself caused some functional limitations. Dr. Taber disagreed, however, that Claimant has a rateable impairment for bilateral hand arthritis. He, however, testified that "tenosynovitis," an inflammation of a tendon sheath, "would be arthritis." Dr. Katz had previously diagnosed tenosynovitis while treating Claimant for the 1980 injury.

Dr. Taber also testified that occipital neuralgia usually is a temporary condition involving an irritation or inflammation of the occipital nerve, which comes out the neck at C1–2 and extends to the base of the skull. He agreed that cervical arthritis, among other conditions such as vascular headache, could cause occipital neuralgia, but he also testified that dizziness and visual disturbances are unusual symptoms suggesting an abnormality of the central nervous system. Dr. Taber did not diagnose occipital neuralgia based on his clinical findings. He agreed that the diagnosis was more neurologic than orthopedic, but he stated that any doctor could make the diagnosis.

Argonaut and the Special Fund submitted post-hearing memoranda. Among other arguments, Argonaut asserted that subsection 23–1065(C) unconstitutionally restricts appor-

tionment to qualified nonindustrial impairments.

ALJ Galloway then issued an award denying apportionment. He found that Claimant's "arthritic condition" was not a hindrance or obstacle to employment or reemployment. He also parenthetically noted that the medical evidence did not establish that the cervical arthritis caused Claimant's "symptoms of headaches, dizziness, and visual impairment." In its Request For Review, Argonaut asserted, among other things, that the findings were legally insufficient. It also reiterated its constitutional argument.

ALJ Stabler, who was assigned the case after ALJ Galloway retired, agreed that the award required more specific findings. He accordingly found that (1) the cervical arthritis is a preexisting nonindustrial physical impairment, Dr. Rand's rating of 6–7% is more probably correct, and the award of April 21, 1977, and records related to the 1974 claim satisfied the written records requirement for the cervical arthritis; (2) the bilateral hand arthritis is a preexisting nonindustrial physical impairment and Dr. Rand's rating of 5% is more probably correct. He also rejected ALJ Galloway's finding that the cervical arthritis was not a hindrance or obstacle to employment or reemployment. He nevertheless denied apportionment because Argonaut had not produced a written record to satisfy the requirement for the hand arthritis and had failed to prove that the cervical arthritis caused the occipital neuralgia or that the occipital neuralgia is permanent. The critical findings state:

6. The testimony of David Schuff, applicant's employer, was offered to prove knowledge of applicant's hand problems. No written records were offered to prove that Mr. Schuff had knowledge of the permanent impairment at the time applicant was hired. Similarly, there are no written records proving that applicant continued in employment after Mr. Schuff acquired such knowledge. The carrier argues that the testimony of Mr. Schuff is sufficient to meet the intent of the written records requirement of the statute. However, this argument directly contradicts the plain language of the statute, which requires written records. The employer's testimony is not mentioned in the statute. While the statute may not necessarily mandate creation of written records contemporaneously with the date of hire or even before the date of injury, written records are in fact required. *See Gilbane Co. v. Poulas,* 576 A.2d 1195 (R.I.1990); *see also,* [sic] *Sea[-]Land Services v. Second Injury Fund,* 737 P.2d 793 (Alaska 1987). While this .requirement may be restrictive and narrow the actual cases that fall within the statute, the undersigned must apply the plain meaning of the statute to the facts of this case. It is the duty of the legislature to change the requirements, not the Industrial Commission. *See State Compensation Fund v. Harris,* 26 Ariz.App. 9, 545 P.2d 1971 [971] (1976); *Window Rock School District No. 8 v. Industrial Commission,* 26 Ariz.App. 14, 545 P.2d 976 (1976). The undersigned cannot ignore the language of the statute in order to provide a more comprehensive remedy than the legislature has provided. *Salt River Project v. Industrial Commission,* 1 CA–IC 91–0082 [172 Ariz. 477, 837 P.2d 1212] (filed September 15, 1992). For the foregoing reasons, the undersigned is unable to consider applicant's pre-existing, nonindustrial 5% permanent impairment to his hands in order to reach the statutory requirement of the 10% pre-existing physical impairment.

7. The final condition which the carrier attempts to include under the cervical arthritis to meet the threshold 10% permanent impairment requirement is the occipital neuralgia. Occipital neuralgia is not listed in A.R.S. § 23–1065(C)(3). Therefore, the carrier argues that it is causally related to applicant's cervical arthritis. However, the undersigned finds that the medical reports of Richard Thompson, M.D. and Betty Ball, M.D., do not state to a reasonable degree of medical probability that applicant's occipital neuralgia is causally related to his cervical arthritis. Moreover, Dr. Taber testified that he did not diagnose occipital neuralgia at the time of his examination in 1991. He further testified that occipital neuralgia could be consistent with cervical arthritis or it could be

a separate condition, but most of the time the condition is temporary. Dr. Rand testified that he did not diagnose occipital neuralgia at the time of his examination in 1991. Asked to assume that applicant had this condition in 1991, Dr. Rand testified that the occipital neuralgia may constitute an additional 5% permanent impairment. However, Dr. Rand testified that occipital neuralgia is a separate condition from cervical arthritis. Finally, according to the Decision Upon Hearing dated April 21, 1977, Dr. Ball was unable to testify that occipital neuralgia was permanent. Based upon a review of the medical testimony, the undersigned finds that the defendant carrier has failed to establish a causal relationship between the cervical arthritis and occipital neuralgia and has failed to show that the occipital neuralgia is a permanent condition.

Argonaut then brought this special action.

## B. Discussion

On review, Argonaut asserts that subsection 23–1065(C) unconstitutionally restricts apportionment to qualified *nonindustrial* impairments. It is also asserted that the ALJ erroneously required a written record establishing that Schuff Steel knew of Claimant's bilateral hand impairment. Argonaut's final assertion is that the ALJ erroneously concluded that Argonaut failed to prove that Claimant's cervical arthritis probably caused his occipital neuralgia and failed to prove that the occipital neuralgia is permanent. We address these assertions in turn.

## 1. Constitutional Challenge–Denial of Equal Protection

■ To qualify for apportionment under subsection 23–1065(C), a carrier must establish that (1) the claimant had a *nonindustrial* preexisting physical impairment due to an enumerated condition; (2) this impairment rates at least 10% under the AMA Guides; (3) this impairment constituted a hindrance or an obstacle to employment or reemployment; and (4) written records indicate that the employer knew of the impairment when it hired the claimant or retained him after it knew of the impairment. A.R.S. § 23–1065(C).[5] Consequently, an *industrially* related impairment does not qualify for apportionment even if it satisfies all other requirements for apportionment.

Argonaut contends that this restriction denies employers of industrially handicapped workers the equal protection guaranteed by the federal and state constitutions. *See* U.S. Const.Amend. XIV, § 1; Ariz. Const. art. 2, § 13. The Special Fund disputes whether Argonaut may challenge the constitutionality of subsection 23–1065(C) and also denies that it violates the constitutional guarantees of equal protection.

■ We first address the questions of whether Argonaut may assert its constitutional challenge. The Special Fund argues that Argonaut lacks "standing" because, having found that Claimant had preexisting cervical and bilateral hand arthritis rating 10% or more under the AMA Guides, the ALJ did

---

**5.** The full text of this subsection provides:

In claims involving an employee who has a preexisting physical impairment which is not industrially-related and, whether congenital or due to injury or disease, is of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed, and the impairment equals or exceeds a ten percent permanent impairment evaluated in accordance with the American medical association guides to the evaluation of permanent impairment, and the employee thereafter suffers an additional permanent impairment not of the type specified in § 23–1044, subsection B, the claim involving the subsequent impairment is eligible for reimbursement, as provided by subsection D of this section, under the following conditions:

1. The employer in whose employ the subsequent impairment occurred or its carrier is solely responsible for all temporary disability compensation to which the employee is entitled.
2. The employer establishes by written records that the employer had knowledge of the permanent impairment at the time the employee was hired, or that the employee continued in employment after the employer acquired such knowledge.
3. The employee's preexisting impairment is due to one or more of the following:

. . . .

(d) Arthritis
A.R.S. § 23–1065(C).

not rely on the exclusion of industrially related impairments to deny apportionment. We disagree. Argonaut contends that Claimant's industrial injuries also caused arthritis and that it easily could have satisfied the statutory requirements for apportionment but for the exclusion of the industrially related arthritis. Consequently, even though Claimant's nonindustrially related arthritis satisfied the statutory rating requirement, the exclusion of impairments from industrially related arthritis prejudiced Argonaut.

■ The Special Fund also argues that Argonaut cannot both invoke the benefits of subsection 23–1065(C) and at the same time challenge its constitutionality. We again disagree. As a general rule, a party may not claim a right granted by a statute and also challenge the terms on which the right is granted. *See Ruth v. Industrial Comm'n,* 107 Ariz. 572, 574, 490 P.2d 828, 830 (1971). The rule applies, however, only if the court considers the challenge inappropriate. *Id.* In our opinion, Argonaut may appropriately attempt to prove that Claimant's nonindustrially related arthritis satisfied subsection 23–1065(C) and also challenge the exclusion of Claimant's industrially related arthritis.

■ We turn then to the merits of the constitutional challenge. Although the federal and state constitutional guarantees of equal protection use different language, their meaning is equivalent. *See Valley National Bank of Phoenix v. Glover,* 62 Ariz. 538, 554, 159 P.2d 292, 299 (1945); *accord, e.g., J.C. Penney Co., Inc. v. Ariz. Dept. Of Revenue,* 125 Ariz. 469, 472, 610 P.2d 471, 474 (App. 1980). They require a rational relationship between every statutory classification and a legitimate statutory purpose ("rational basis"). *E.g., McLaughlin v. Florida,* 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964); *Lindsay v. Industrial Comm'n,* 115 Ariz. 254, 256, 564 P.2d 943, 945 (App.1977).

■ Argonaut principally argues that the exclusion of *industrially related* impairments does not satisfy even minimal standards of rationality. It, however, also argues that strict scrutiny should apply because the handicapped are a suspect class. To the contrary, the Supreme Court applied the rational basis test to a classification based on the handicap of mental retardation in *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 445–46, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) (declining to treat "the aging, the disabled, the mentally ill, and the infirm" as a quasi-suspect class). Furthermore, the rational basis test traditionally applies to social legislation such as workers' compensation. *See, e.g., Lindsay,* 115 Ariz. at 256, 564 P.2d at 945 ("Equal protection requires that the classification ... be founded upon reason...."); *cf., e.g., Bowen v. Owens,* 476 U.S. 340, 345–46, 106 S.Ct. 1881, 1885–86, 90 L.Ed.2d 316 (1986) (applying rational basis test to classification based on marital status in Social Security Act). We accordingly apply the rational basis test in the current case.

Argonaut correctly argues that the purpose of subsection 23–1065(C) is to encourage employment of handicapped workers by apportioning liability for permanent disability. *E.g., State Compensation Fund v. Harris,* 26 Ariz.App. 9, 13, 545 P.2d 971, 975 (1976) (construing predecessor statute). This purpose would seem to apply to similarly handicapped workers regardless of the origin of their handicap. *Cf., e.g., Lawson v. Suwanee Fruit & Steamship Co.,* 336 U.S. 198, 201–06, 69 S.Ct. 503, 504–07, 93 L.Ed. 611 (1949) (construing term "disability" in federal second injury fund statute to apply not only to industrial disabilities, but also to nonindustrial disabilities). Yet the Arizona Legislature has expressly distinguished apportionable claims from nonapportionable claims on the basis of the *origin* of a handicap, i.e. nonindustrial vs. industrial.

The Special Fund answers with several arguments. First, it denies that subsection 23–1065(C) treats similarly situated employers differently. According to the Special Fund, the subsection treats all employers of nonindustrially handicapped workers similarly by allowing apportionment; it treats all employers of industrially handicapped workers similarly by denying apportionment.

Second, the Special Fund argues that the classification is rational because industrially disabled workers receive workers' compensation and their employers may claim appor-

tionment under A.R.S. subsection 23–1044(E) (1983). This is true, see *R.G. Roth Const. Co. v. Industrial Comm'n*, 126 Ariz. 147, 149–51, 613 P.2d 307, 309–11 (App.1980), but a worker may have a handicap without having an earning capacity disability. *See Special Fund Division v. Industrial Comm'n*, 182 Ariz. 341, 347, 897 P.2d 643, 649 (App.1994). Subsection 23–1044(E) does not protect employers of these industrially handicapped workers.

Furthermore, subsection 23–1044(E) also applies to nonindustrially related preexisting impairments that are earning capacity disabling. *See, e.g., W.F. Dunn, Sr. & Son v. Industrial Comm'n*, 160 Ariz. 343, 348–49, 773 P.2d 241, 246–47 (App.1989). And although workers with nonindustrially related handicaps do not receive workers' compensation for the preexisting disability, this does not justify the disparate treatment under subsection 23–1065(C), which burdens the employer, not the worker. Unlike some second injury fund statutes that provide additional benefits to the worker, *see, e.g., Verberg v. Simplicity Pattern Co.*, 357 Mich. 636, 99 N.W.2d 508, 509–10 (1959), subsection 23–1065(C) does not provide additional benefits, but rather *apportions* responsibility for permanent disability benefits between the employer or its carrier and the Special Fund. *See* A.R.S. § 23–1065(C)(4).

Third, the Special Fund argues that subsection 23–1065(C) is constitutional even if including industrially handicapped workers would better serve the purpose of apportionment. We agree that subsection 23–1065(C) is underinclusive but that it nevertheless is constitutional. In *Bowen*, for example, the Supreme Court justified an underinclusive classification under the Social Security Act in part because

> Congress' adjustments of this complex system of entitlements necessarily create distinctions among categories of beneficia-

ries, a result that could be avoided only by making sweeping changes in the Act instead of incremental ones. A constitutional rule that would invalidate Congress' attempts to proceed cautiously in awarding benefits might deter Congress from making any increases at all. The Due Process Clause does not impose any such " 'constitutional straightjacket.' "

476 U.S. at 348, 106 S.Ct. at 1886 (citations omitted).

Subsection 23–1065(C) is a similar example of cautious piecemeal reform. Its predecessor was so restrictive that it rarely applied. *See Harris*, 26 Ariz.App. at 13, 545 P.2d at 975 (calling for amendment of apportionment statute); *accord Window Rock School District # 8 v. Industrial Comm'n*, 26 Ariz.App. 14, 16–17, 545 P.2d 976, 978–79 (1976) (rejecting judicial expansion of statute because legislature provided limited funding for special fund). In 1986, the legislature responded by enacting subsection 23–1065(C) in its current form. *See* 1986 Ariz.Sess.Laws 535–40 (retroactively applicable to Jan. 1, 1986). This amendment greatly expanded the scope of apportionment in Arizona by adopting in part the Model Workmen's Compensation and Rehabilitation Law. *See Salt River Project v. Industrial Comm'n*, 172 Ariz. 477, 480, 837 P.2d 1212, 1215 (App.1992) (quoting Model Workmen's Compensation and Rehabilitation Law (Revised) § 20 (The Council of State Governments 1963) ("Model Act") *reprinted in* 4 Larson, *Workmen's Compensation Law*, at 631, 670–72 (1990)). Although the legislature narrowed the Model Act by excluding industrially related impairments,[6] this decision to adopt only part of the Model Act does not invalidate the incremental but nonetheless substantial reform of apportionment.

Moreover, apportionment is only one of the remedial purposes of the Special Fund; others include supportive medical care, *see* A.R.S. § 23–1062(A), vocational rehabilitation, *see* A.R.S. § 23–1065(A), and compensa-

---

6. The legislature also narrowed the Model Act by deleting the catchall provision permitting apportionment for unlisted impairments. *See id.* at 480–81, 837 P.2d at 1215–16. On the other hand, the legislature expanded apportionment beyond the provisions of the Model Act. The Model Act applies only if the resulting disability is substantially greater than would have resulted from the industrial injury alone. *See* Model Act § 20(a). Subsection 23–1065(C) applies even if the industrial injury or resulting disability is unrelated to the preexisting impairment. *See* A.R.S. § 23–1065(C).

tion of claims against uninsured employers, *see* A.R.S. § 23–907(B). Because more sweeping reform of apportionment would also cost more, the legislature had to balance this increased cost with the cost of achieving the other purposes of the Special Fund.[7]

For these reasons, we reject Argonaut's equal protection challenge to subsection 23–1065(C). We turn now to its arguments concerning the interpretation and application of the written records requirement.

### 2. Written Records Requirement

■ To obtain apportionment, the employer or its carrier must establish "by written records that the employer had knowledge of the permanent impairment at the time the employee was hired, or that the employee continued in employment after the employer acquired such knowledge." A.R.S. § 23–1065(C)(2). The Model Act has a substantially similar written records requirement. *See* Model Act § 20(c).

In the current case, the ALJ found that Argonaut satisfied the written records requirement as to Claimant's impairment from cervical arthritis but failed to satisfy it as to his impairment from bilateral hand arthritis. Argonaut asserts that the ALJ illogically and unforeseeably extended the written records requirement to the bilateral hand impairment because the same enumerated cause, i.e., arthritis, affects both body parts and Argonaut established by written records that Schuff Steel knew that Claimant had arthritis. We disagree.

Subpart (2) of subsection 23–1065(C) precedes the restriction of apportionable impairments to listed causes. *See* A.R.S. § 23–1065(C)(3) ("The employee's preexisting impairment is due to one or more of the following [causes]: ... [a]rthritis.") The reference in subpart (2) to "the permanent impairment" therefore must refer to a previously identified impairment, not to the causes subsequently listed in subpart (3). This impairment is defined in the preceding paragraph, which among other things requires an impairment that "equals or exceeds a ten per

cent permanent impairment evaluated in accordance with the American medical association guides to the evaluation of permanent impairment...." A.R.S. § 23–1065(C). Consequently, if the impairment rating of at least 10% under the AMA Guides includes more than one impairment, then the written records requirement applies to each necessary impairment.

Argonaut contends that this interpretation leads to the absurd result that a written record referring generally to a worker's arthritis will not satisfy the written records requirement. The defect in the current case, however, is not that the records Argonaut submitted refer generally to Claimant's arthritis, but that they refer specifically to his cervical arthritis. Whether a general reference will satisfy the written records requirement will depend on the facts presented in each case. We agree with the ALJ, however, that in the present case the records establishing that Schuff Steel knew of Claimant's impairment from cervical arthritis do not establish that it knew of his impairment from bilateral hand arthritis.

Argonaut also contends that it could have satisfied the written records requirement with Dr. Katz's report diagnosing tenosynovitis but did not do so because it could not have foreseen that this proof would be required. Having rejected the argument that the ALJ's interpretation is illogical, we also reject the argument that it is unforeseeable. We also suspect that what Argonaut failed to foresee was Dr. Taber's surprising testimony defining tenosynovitis as arthritis. Furthermore, if during discovery Argonaut had disclosed an intent to rely on this record to establish the employer's knowledge of Claimant's impairment from bilateral hand arthritis, the Special Fund might have been prepared to question this definition.

■ Argonaut alternatively argues that knowledge of Dr. Katz's reports should be imputed to Schuff Steel because its compensation carrier for the 1980 industrial injury knew of these reports. We need not decide whether the written records requirement demands actual rather than imputed knowl-

---

7. We recognize that section 23–1065 includes a contingent funding mechanism if apportionment

claims exceed a specified amount. *See* A.R.S. § 23–1065(F).

edge. Under general principles of agency, the "principal is affected by the knowledge which the agent has *when acting for him....*" Restatement (Second) of Agency § 278 at 605 (1958) (emphasis added). After an agency relationship has terminated, the knowledge of an agent is imputed to the principal only if the agent had a duty to communicate the knowledge to the principal and, if the knowledge becomes relevant only later, then only during such time as the facts should have been remembered. *Id.* cmts. b, c.

■ In the present case, absent a direct request from Schuff Steel, the carrier at the time of the industrial injury had no duty to communicate the content of Dr. Katz's reports to Schuff Steel. Furthermore, the content of the reports became relevant only years later. We accordingly disagree that Schuff Steel had even imputed knowledge of Dr. Katz's diagnosis of tenosynovitis.

Argonaut lastly asserts that the hearing transcripts in this case constitute written records satisfying the written records requirement. To this end, it relies on *Gilbane Co. v. Poulas,* 576 A.2d 1195 (R.I.1990). In *Gilbane,* the Rhode Island Supreme Court concluded that a letter from the employer to the carrier written two years after the industrial injury satisfied a written records requirement that is substantially similar to subpart (2) of subsection 23–1065(C).

We need not decide whether to interpret Arizona's written records requirement this liberally. To interpret this requirement as Argonaut suggests, however, totally eviscerates the written records requirement. The legislature has imposed this specific requirement, and we cannot negate it by interpretation. *Cf.* 2 Arthur Larson, *supra,* § 59.33(g), at 10–523 to 10–528 (1993) (noting conflict between written records requirement and The Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 (Supp. III 1991) (effective July 26, 1992, as to employers with twenty-five or more employees; effective July 25, 1994, as to employers with fifteen or more employees), and recommending amend-

ment of second injury fund statutes to eliminate requirement of employer knowledge).

For these reasons, we reject Argonaut's arguments concerning the interpretation and application of the statutory written records requirement. We turn finally to its last arguments concerning the finding denying apportionment for the cervical arthritis and occipital neuralgia.

### 3. Occipital Neuralgia

■ Argonaut concedes that it had to prove to a reasonable medical probability that the cervical arthritis caused the occipital neuralgia and that the occipital neuralgia is permanent. This is so because occipital neuralgia is not an enumerated cause under subpart (3) of subsection 23–1065(C) and because subsection (C) applies to permanent impairments. *See* A.R.S. § 23–1065(C). Argonaut, however, fails to recognize that muscle contraction headaches and occipital neuralgia are distinct symptoms. A person can have muscle contraction headaches without occipital neuralgia or occipital neuralgia without muscle contraction headaches. This distinction is critical because the impairment contributing to the required 10% must be rateable under the AMA Guides. *See* A.R.S. § 23–1065(C). Occipital neuralgia may qualify for such a rating,[8] *see Guides to the Evaluation of Permanent Impairment* ("AMA Guides") 113, Table 5 (Alan L. Engelberg, M.D., M.P.H. ed., 3rd ed. rev. 1990), but Argonaut has never contended that muscle contraction headaches are separately rateable under the AMA Guides.

Argonaut asserts that the ALJ ignored the only reasonable inference from the record by concluding that Argonaut failed to prove to a reasonable medical probability that the cervical arthritis caused occipital neuralgia or that the occipital neuralgia is permanent. We disagree because the ALJ reasonably concluded that Argonaut failed to prove that the occipital neuralgia is permanent. We accordingly need not address the sufficiency of Argonaut's proof of causation because we must affirm an award if one of the alternative

---

**8.** We express no opinion whether this table properly applies to occipital neuralgia.

findings supports it.[9] *E.g., Scroggins v. Industrial Comm'n,* 123 Ariz. 35, 36, 597 P.2d 188, 189 (App.1979).

Dr. Taber testified that occipital neuralgia usually is temporary. Argonaut did not cross-examine Dr. Taber on this point and did not elicit a conflicting opinion from Dr. Rand. It instead relies on Claimant's testimony that his headaches continued from 1974 to the present. As noted above, however, headaches are not the same as occipital neuralgia. Furthermore, Claimant also testified that he has avoided the more severe symptoms since 1976. Because occipital neuralgia is not apparent to a layman, medical evidence was necessary to determine if Claimant's ongoing symptoms included occipital neuralgia. *Cf., e.g., Asbestos Engineering & Supply Co. v. Industrial Comm'n,* 131 Ariz. 558, 561, 642 P.2d 903, 906 (App.1982) (setting aside award because even credible lay evidence of defective vision insufficient because visual impairment not obvious to layman). Argonaut failed to produce this necessary medical evidence.

### C. Conclusion

In summary, we conclude that subsection 23–1065(C) is constitutional despite its exclusion of industrially related impairments. We also conclude that the written records requirement applied to Claimant's impairment from bilateral hand arthritis but Argonaut failed to satisfy the requirement. We further conclude that Argonaut failed to prove that Claimant's occipital neuralgia is permanent. We accordingly affirm the Decision denying apportionment.

The award is affirmed.

WEISBERG, P.J., and TOCI, J., concur.

---

9. We note, however, in addition to the reasons the ALJ stated, the radiographic evidence in 1976 failed to establish that Claimant had cervical arthritis. The ALJ therefore had reason to doubt the causation opinions of Drs. Thompson and Ball even if their reports expressed their opinions to a reasonable medical probability.