302 P.3d 635

**SPECIAL FUND DIVISION, Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Karen Lane, Respondent Employee,**

**HealthSouth, Respondent Employer,**

**ESIS/Ace USA AZ, Respondent Carrier.**

**No. 1 CA–IC 12–0018.**

Court of Appeals of Arizona, Division 1, Department A.

April 18, 2013.

The Industrial Commission of Arizona, Special Fund Division by Stephen D. Ball, Phoenix, Attorney for Petitioner.

Andrew F. Wade, Chief Counsel, The Industrial Commission of Arizona, Phoenix, Attorney for Respondent.

Dix & Forman, P.C. by Robert J. Forman, Tucson, Attorneys for Respondent Employee.

Klein, Doherty, Lundmark, Barberich & La Mont, P.C. by Eric W. Slavin, Tucson, Attorneys for Respondents Employer and Carrier.

## OPINION

GEMMILL, Judge.

¶ 1 This is a special action review of an Industrial Commission of Arizona ("ICA") award and decision upon review granting reimbursement—often called "apportionment"—under Arizona Revised Statutes ("A.R.S.") section 23–1065(C)(3)(e) (Supp. 2012), in favor of the Employer and Carrier against Petitioner Special Fund Division. The injured worker, Karen Lane, has a pre-existing congenital condition of her hands known as syndactyly.[1] The administrative law judge ("ALJ") granted apportionment based on Lane's syndactyly, concluding that the syndactyly qualified under § 23–1065(C)(3)(e) as an "[a]mputated ... hand." Because we conclude as a matter of law that Lane's syndactyly is not included within A.R.S. § 23–1065(C)(3), we set aside the award of apportionment.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Karen Lane worked for the Respondent Employer, HealthSouth, as a licensed practical nurse. In December 2006, she injured her lower back while transferring a patient from a bed to a wheelchair. Lane filed a workers' compensation claim that was accepted for benefits. After conservative medical treatment failed to improve Lane's condition, she underwent lumbar surgery. It was determined that Lane had an unscheduled permanent impairment. The ICA subsequently entered its findings and award for a 6% permanent impairment, resulting in an 18.19% loss of earning capacity, and disability benefits of $240.15 per month. Believing she had sustained a greater loss of earning capacity, Lane requested a hearing.

¶ 3 Before the ALJ, both parties filed labor market expert reports and presented expert testimony. The ALJ entered an award increasing Lane's monthly benefit to $618.40. The issue of apportionment was deferred to a

---

1. Syndactyly is a "congenital anomaly of the hand or foot, marked by persistence of the webbing between distal phalanges of adjacent digits, so that they are more or less completely attached." Dorland's Illustrated Medical Dictionary 1845 (31st ed. 2007).

future hearing. The Employer and Carrier then moved to join the Petitioner, Special Fund, in order to seek reimbursement from the Special Fund under A.R.S. § 23–1065(C).

¶ 4 At the apportionment hearing, the ALJ received medical testimony from Marjorie Eskay–Auerbach, M.D., J.D., and Peter Campbell, M.D. Dr. Eskay–Auerbach, a board certified orthopedic surgeon, testified that she performed a medical examination of Lane in December 2010. The doctor described Lane's condition as having a "hand with the middle finger and thumb missing, and the index finger is sort of moved over closer to where the thumb" is normally located. She recognized Lane's condition as preexisting syndactyly and explained that she used the American Medical Association Guides to the Evaluation of Permanent Impairment ("AMA Guides") to rate this preexisting impairment, relying on Table 15–28, "Impairment for Upper Limb Amputation at Various Levels." *See* AMA Guides 457 (6th ed. 2009).

¶ 5 Dr. Eskay–Auerbach based her impairment rating on two fingers missing from each hand, including the absence of two metacarpal bones per hand. The doctor opined that Lane has a 23% whole person impairment based on four missing fingers and the associated metacarpal bones. She testified that the AMA Guides typically do not differentiate between a congenital condition and a traumatic injury, but instead, measure objective anatomic findings. She also recognized that the AMA Guides provide an impairment rating for the amputation of an entire hand, but in her opinion, that provision was not applicable to Lane.

¶ 6 Dr. Campbell, a board certified orthopedic surgeon qualified in hand and upper extremity reconstruction, testified that he also examined Lane in order to evaluate her potential permanent impairment rating due to her syndactyly. Dr. Campbell opined that being born with a congenital cleft hand or foot did not constitute an amputation. Further, he disagreed with Dr. Eskay–Auerbach's rating determination because she utilized the section of the AMA Guides applicable to the traumatic amputation of digits. He explained that the ratings under that

section of the AMA Guides include all of the additional ramifications of a traumatic amputation, i.e., "loss of function in adjacent digits, loss of activity available before injury, loss of strength, etc."

¶ 7 At the conclusion of the hearing, the ALJ entered an award granting apportionment. The ALJ resolved the conflicts in the medical evidence in favor of the testimony of Dr. Eskay–Auerbach, who had likened Lane's syndactyly "to an amputation of two digits on each hand."

¶ 8 The Special Fund requested review, and the ALJ supplemented and affirmed the award on administrative review. The Special Fund timely appeals to this court, and we have jurisdiction under A.R.S. §§ 12–120.21(A)(2) (2003), 23–951(A) (2012), and Arizona Rule of Procedure for Special Actions 10.

## ANALYSIS

¶ 9 The issue raised on appeal is whether the ALJ erred by awarding apportionment. No question is presented regarding the amount and duration of compensation benefits payable to Lane. Rather, the issue is whether the Employer and Carrier must pay the entire claim or whether Special Fund must reimburse part of the cost of the claim, in accordance with A.R.S. § 23–1065(C).

¶ 10 We deferentially review reasonably supported factual findings, but independently review legal conclusions. *Young v. Indus. Comm'n*, 204 Ariz. 267, 270, ¶ 14, 63 P.3d 298, 301 (App.2003). On questions regarding statutory interpretation, our review is de novo. *Universal Roofers v. Indus. Comm'n*, 187 Ariz. 620, 622, 931 P.2d 1130, 1132 (App.1996). In this case, whether the Employer and Carrier are "entitled to reimbursement under A.R.S. 23–1065(C) is an issue of statutory interpretation that we review de novo." *Special Fund Div. v. Indus. Comm'n (Sordia)*, 224 Ariz. 29, 31, ¶ 7, 226 P.3d 398, 400 (App.2010).

¶ 11 In order to obtain apportionment, the employer or carrier is required to meet certain conditions specified in A.R.S. § 23–1065, including the establishment of a qualified preexisting impairment. An award of appor-

tionment in this case requires that Lane's preexisting syndactyly qualify under A.R.S. § 23–1065(C)(3)(e):

> C. In claims involving an employee who has a preexisting physical impairment which is not industrially-related and, whether congenital or due to injury or disease, is of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed, and the impairment equals or exceeds a ten per cent permanent impairment evaluated in accordance with the American medical association guides to the evaluation of permanent impairment, and the employee thereafter suffers an additional permanent impairment not of the type specified in § 23–1044, subsection B, *the claim involving the subsequent impairment is eligible for reimbursement, as provided by subsection D of this section, under the following conditions:*
>
> . . . .
>
> 3. *The employee's preexisting impairment is due to one or more of the following:*
>
> . . . .
>
> (e) *Amputated* foot, leg, arm or *hand.*

(Emphasis added.)

¶ 12 "The primary goal in interpreting a statute is to determine and give effect to the intent of the legislature." *DeVries v. State,* 221 Ariz. 201, 204, ¶ 6, 211 P.3d 1185, 1188 (App.2009). The plain language of the statute is the most reliable indicator of the statute's meaning. *See New Sun Bus. Park, LLC v. Yuma Cnty.,* 221 Ariz. 43, 46, ¶ 12, 209 P.3d 179, 182 (App.2009). In determining the ordinary meaning of a word, we may refer to established and widely used dictionaries. *State v. Wise,* 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983). We assume the legislature has given words their natural and obvious meanings unless otherwise stated. *State v. Garcia,* 219 Ariz. 104, 106, 193 P.3d 798, § 6, 219 Ariz. 104, 193 P.3d 798, 800 (App.2008) (citing A.R.S. § 1–213 (2002)). If the language is clear and unambiguous, there is usually no need to resort to the rules of statutory interpretation. *State v. Gomez,*

212 Ariz. 55, 57, ¶ 11, 127 P.3d 873, 875 (2006).

¶ 13 The Employer and Carrier argue that syndactyly, although a congenital condition, qualifies as an "amputation" under the apportionment statute. Applying the principles enumerated in the preceding paragraph, we first look to the plain language and ordinary meaning of the words contained in A.R.S. § 23–1065(C)(3)(e) to determine the statute's meaning. An accepted medical definition of an amputation is "the removal of a limb or other appendage or outgrowth of the body." Dorland's Illustrated Medical Dictionary 68 (31st ed. 2007). It derives from the Latin meaning to cut off or to prune. *Id.* According to another reputable dictionary, "amputate" can mean to "cut off (a limb), typically by surgical operation." The New Oxford American Dictionary 53 (2d ed. 2005); *see also* Webster's II New College Dictionary 39 (2001) (similarly defining "amputate"). Although the apportionment statute includes certain congenital conditions as qualified preexisting conditions, an "amputation" is distinct and is the result of a cutting off or "removal." Because Lane's syndactyly was congenital and did not involve a cutting off or "removal" of her fingers or hands, it is not an "amputation" within the meaning of the statute.

¶ 14 Even if we assume that Lane's syndactyly qualifies as an amputation under § 23–1065(C)(3)(e), her condition of missing two fingers on each hand does not qualify as an amputation of her "hands." Based on the language of the statute, amputation of a hand is something more than amputation of two fingers.

¶ 15 Section 23–1065(C) mandates the use of the AMA Guides in determining permanent impairment ratings. Our interpretation of the plain meaning of § 23–1065(C)(3)(e)— that an amputation of two fingers is distinct from and does not constitute an amputation of the hand—is supported by the AMA Guides:

> The upper limb is considered as a unit of the whole person and is *divided into thumb, fingers, hand, wrist, elbow, and shoulder.* From distal to proximal, *each anatomic unit is given a relative value to*

*the next larger unit,* and eventually, the whole person.

AMA Guides 454 (emphasis added).

¶ 16 Our interpretation of § 23–1065(C)(3)(e) is also supported by its legislative history. In 1986, when the Arizona legislature substantially amended the apportionment statute, it did so by adopting in part the Model Workmen's Compensation and Rehabilitation Law ("Model Act"). *See Salt River Project v. Indus. Comm'n,* 172 Ariz. 477, 480, 837 P.2d 1212, 1215 (App.1992). In addition to authorizing apportionment for claims involving employees with preexisting impairments due to one or more of the enumerated conditions, the Model Act included a catch-all provision allowing apportionment for unlisted conditions resulting in a specified degree of disability. See Model Act (Revised) § 20(d) (The Council of State Governments 1963), *reprinted in Salt River Project,* 172 Ariz. at 481, 837 P.2d at 1216 ("No condition shall be considered a 'permanent impairment' unless it is one of the following [listed] conditions *or unless it would support a rating of disability of 200 weeks or more if evaluated according to standards applied in compensation claims.*") (emphasis added).

¶ 17 In adopting the Model Act, however, the Arizona legislature conspicuously omitted the catch-all provision. *Salt River Project,* 172 Ariz. at 481, 837 P.2d at 1216. In recognizing the significance of this omission, this court in *Salt River Project* concluded that the legislature's exclusion of the catch-all provision indicated its intent "to restrict apportionment to the listed specific impairments." *Id.* Although an "amputated ... hand" is enumerated as a qualifying preexisting impairment, neither syndactyly nor the congenital absence of one or more fingers is listed. The conclusion that Lane's syndactyly is not a qualifying impairment under § 23–1065(C)(3)(e) is further bolstered by the legislature's decision to not include a catch-all provision in this statute, thereby emphasizing that only specifically listed impairments justify apportionment.

¶ 18 For these reasons, we conclude as a matter of law that the apportionment statute does not support the ALJ's decision equating Lane's syndactyly with an amputated hand.[2]

¶ 19 The Employer and Carrier urge a liberal interpretation of § 23–1065(C)(3)(e), as encouraged by *Special Fund Div. v. Indus. Comm'n (Burrell),* 191 Ariz. 149, 152–53, ¶¶ 9–10, 953 P.2d 541, 544–45 (1998). The main purpose of an apportionment statute and a "second injury fund" is to "promote the hiring of disabled or handicapped workers." *Id.* Although we recognize the principle enunciated by the Arizona Supreme Court that a statute designed for such a purpose should be construed broadly, this principle of statutory interpretation does not override the requirement of an "amputation" of the "hand" set forth in the statute. *See Prince & Princess Enters., LLC v. State ex rel. Ariz. Dep't of Health Servs.,* 221 Ariz. 5, 6, ¶ 5, 209 P.3d 141, 142 (App.2008).

## CONCLUSION

¶ 20 Based on Karen Lane's syndactyly and the language of A.R.S. § 23–1065(C)(3)(e), we conclude as a matter of law that Lane's preexisting condition is not listed within the statute. We therefore set aside the award of apportionment.

CONCURRING: JON W. THOMPSON, Judge, and LAWRENCE F. WINTHROP, Chief Judge.

---

2. Our ultimate determination does not depend on the ALJ's resolution of disputed facts or conflicting medical opinions. We note, nonetheless, that our conclusion is supported by certain testimony proffered at the ALJ hearing. Specifically, Dr. Eskay–Auerbach recognized Lane did not suffer an amputation of a hand as a result of her syndactyly and, consistent with that conclusion, did not apply the corresponding impairment rating. Instead, she applied an impairment rating based on two fingers missing from each hand. And the ALJ, in her decision, also described Lane's syndactyly as "an amputation of two digits on each hand."