NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

# IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

BARNEY C. VERDUGO,
*Petitioner*

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA,
*Respondent,*

PHOENIX UNION HIGH SCHOOL DISTRICT 210,
*Respondent Employer,*

ARIZONA SCHOOL ALLIANCE FOR
WORKERS COMPENSATION,
*Respondent Carrier,*

SPECIAL FUND DIVISION,
*Respondent Party in Interest.*

No. 1 CA-IC 16-0046
FILED 7-13-2017

Special Action - Industrial Commission
ICA Claim No. 20120400286
Carrier Claim No. 2011025619A
Rachel C. Morgan, Administrative Law Judge

**AWARD AFFIRMED**

COUNSEL

Barney C. Verdugo, Phoenix
*Petitioner*

Industrial Commission of Arizona, Phoenix
By Jason M. Porter
*Counsel for Respondent*

Jardine, Baker, Hickman & Houston, P.L.L.C., Phoenix
By K. Casey Kurth
*Counsel for Respondent Employer/Carrier*

Special Fund Division, Phoenix
By Scott J. Cooley
*Counsel for Respondent Party in Interest*

---

**MEMORANDUM DECISION**

---

Acting Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Patricia A. Orozco and Judge Maurice Portley joined.[1]

---

**B R O W N**, Judge:

¶1　　　This is a special action review of an Industrial Commission of Arizona ("ICA") award and decision on review. Claimant Barney C. Verdugo challenges the Administrative Law Judge's ("ALJ") decision denying supportive care, finding no loss of earning capacity, and granting apportionment based on a pre-existing condition. For the following reasons, we affirm.

---

[1]　　The Honorable Patricia A. Orozco and the Honorable Maurice Portley, Retired Judges of the Court of Appeals, Division One, have been authorized to sit in this matter pursuant to Article VI, Section 3 of the Arizona Constitution.

## BACKGROUND

¶2        On January 23, 2012, while working as a custodian for Phoenix Union High School District ("PUHSD"), Verdugo injured his left arm and shoulder.  He had propped open an exterior bathroom door while he cleaned inside.  When Verdugo exited, he kicked out the doorstop, causing the heavy door to quickly close.  The door struck his left arm, from his forearm to near his shoulder.  He immediately felt pain from just below his left elbow to his shoulder and could not move his fingers.

¶3        Verdugo received treatment at an emergency room the day he was injured, and about one week later began treatment with Dr. Michael Steingart.  An MRI showed a collateral ligament tear of his radial left elbow, and Verdugo's workers' compensation claim was accepted for benefits.  Dr. Steingart surgically repaired the elbow in March 2012.  In June, based on Verdugo's left shoulder complaints, Dr. Steingart ordered an MRI of that area, which showed a "massive" rotator cuff tear.

¶4        Based on an independent medical examination ("IME") conducted in October 2012, Respondents (PUHSD and its carrier, the Arizona School Alliance for Workers' Compensation) closed Verdugo's claim without permanent impairment on October 22, 2012.  Verdugo protested closure and requested a hearing.

¶5        At the evidentiary hearing, Dr. Steingart opined, in part, that Verdugo "more than likely" had a "preexisting asymptomatic injury," which was permanently aggravated by the industrial injury.  Dr. Steingart further opined that the shoulder required active treatment in the form of medication, injections, and possible surgery.

¶6        Respondents' IME doctor, Dr. Anthony Theiler, agreed with Dr. Steingart that there were pre-existing tears in the left shoulder.  But he also described "a massive chronic rotator cuff tear with chronic tears of essentially the whole rotator cuff muscle unit . . . [and] early degenerative changes on the humeral joint with significant superior migration of the humeral head which would go along with a chronic massive rotator cuff tear."  Dr. Theiler disagreed with Dr. Steingart that the incident that injured Verdugo could have significantly aggravated the already essentially fully-torn rotator cuff muscle unit, calling the injury "simply a contusion."

¶7        The ALJ resolved the conflicting medical evidence and testimony in favor of Dr. Steingart, finding that Verdugo had "sustained an aggravation of his pre-existing left shoulder condition as a result of the

subject industrial injury" and awarding medical treatment and disability benefits until the shoulder injury became medically stationary. Verdugo returned to treatment with Dr. Steingart.

¶8        In April 2014, Respondents obtained another IME, from Dr. Evan Lederman, who interpreted the June 2012 MRI as showing that Verdugo had sustained a "sprain-strain" and that the damage could not have occurred by the "minimal traumatic injury" he sustained. Dr. Lederman could not relate Verdugo's shoulder problems to the industrial injury and opined that he suspected that Verdugo had aggravated an "underlying chronic rotator cuff insufficiency of the left shoulder." He concluded that Verdugo did not need supportive care and recommended no work restrictions. Respondents again closed Verdugo's claim, effective April 7, 2014.

¶9        The ICA determined that Verdugo sustained a 1% unscheduled permanent impairment based on the opinion of Dr. Lederman but did not sustain a loss of earning capacity because no medical contraindications would preclude him from returning to the same or similar work as he was performing on the date of injury. Verdugo protested the denial of unscheduled permanent partial disability benefits and sought authorization for supportive care by Dr. Steingart pursuant to Arizona Revised Statutes ("A.R.S.") section 23-1061(J). Respondents asserted their entitlement to apportionment pursuant to A.R.S. § 23-1065(C). The ALJ consolidated the requests and held hearings over four days at which Verdugo, Dr. Steingart, Dr. Lederman, and two labor-market consultants testified.

¶10        In reaching a decision, the ALJ adopted the opinion of Dr. Lederman, finding that Verdugo had not sustained a loss of earning capacity and did not need supportive medical care. The ALJ also found that the Special Fund Division ("Fund") had stipulated to apportionment pursuant to A.R.S. § 23-1065(C) based on Verdugo's pre-existing diabetes.

¶11        Verdugo sought review of the decision in general and cited specific inaccuracies. The ALJ issued a supplement reaffirming the decision. Among other points, the ALJ clarified that Dr. Steingart had opined that Verdugo had a 7% permanent impairment to the left shoulder, but the ALJ resolved the conflicting evidence concerning the rating of impairment in favor of Dr. Lederman's opinion. Verdugo then filed this special action.

**DISCUSSION**

**¶12**         We review questions of law de novo and defer to the ALJ's factual findings. *Young v. Indus. Comm'n,* 204 Ariz. 267, 270, ¶ 14 (App. 2003). We review the evidence in the light most favorable to sustaining the award and will affirm if it is supported by reasonable evidence and no legal error has occurred. *Delgado v. Indus. Comm'n*, 183 Ariz. 129, 131 (App. 1994).

**¶13**         Verdugo bears the burden of proving his need for supportive medical care and entitlement to unscheduled permanent disability benefits (based on loss of earning capacity) by a reasonable preponderance of the evidence. *Brooks v. Indus. Comm'n*, 24 Ariz. App. 395, 399 (1975). If the evidence conflicts, the ALJ resolves those conflicts. *Perry v. Indus. Comm'n,* 112 Ariz. 397, 398 (1975). We will not overturn an ALJ's resolution of a conflict in the medical evidence unless it is wholly unreasonable. *Graver Tank & Mfg. Co. v. Indus. Comm'n*, 96 Ariz. 356, 360 (1964).

### A.      Supportive Care

**¶14**         Verdugo challenges the ALJ's ruling denying his request for supportive medical care based on his left shoulder issues. Supportive care benefits are "designed to prevent or reduce the continuing symptoms of an industrial injury after the injury has become stabilized." *Capuano v. Indus. Comm'n*, 150 Ariz. 224, 226 (App. 1986). Whether to provide such benefits necessarily presents a transitory issue, based on a claimant's evolving physical condition in relation to his industrial injury. *Brown v. Indus. Comm'n*, 199 Ariz. 521, 524, ¶ 14 (App. 2001).

**¶15**         Dr. Steingart, a board-certified orthopedic surgeon who described his practice as focusing on minimally invasive spinal surgery and sports medicine, recommended supportive care for Verdugo's left shoulder consisting of medications, injections, and office visits. He described Verdugo as having suffered "a tremendous injury" to his left arm.

**¶16**         Dr. Lederman, a board-certified orthopedic surgeon who described his practice as focusing on injuries to the shoulder, agreed that Verdugo had a massive rotator cuff tear but testified that it was a chronic, not an acute, tear. He opined that Verdugo did not need supportive medical care resulting from the industrial injury because the rotator cuff tear had been present for a long time. He testified that the diagnostic studies documented that the left shoulder tendons were retracted, the muscle bellies were atrophied and replaced by fat, and the greater tuberosity was remodeled, which is evidence of a long-standing condition

that is not amenable to surgery. He found no reason for Verdugo to be taking narcotics as a supportive care regime.

¶17 The ALJ resolved the conflict between Dr. Steingart's and Dr. Lederman's opinions about the need for supportive care benefits in favor of Dr. Lederman's opinion as being "more probably well-founded and correct."

¶18 Verdugo argues that the ALJ should not have adopted Dr. Lederman's opinion because Dr. Lederman met with him only once while Dr. Steingart submitted "plenty" of evidence to support his need for supportive care. He also disputes that he had a pre-existing rotator cuff tear because he did not have shoulder pain prior to his injury and could engage in heavy work. In response, Respondents submit that Dr. Lederman's opinion was based on his review of Verdugo's medical records as well as an IME and that it was not wholly unreasonable for the ALJ to adopt Dr. Lederman's opinion.

¶19 Verdugo's arguments essentially challenge the weight the ALJ gave to Dr. Lederman's opinion. The ALJ, however, was not required to give greater weight to the opinion of Verdugo's treating physician than to the opinion of the IME doctor. *See Walters v. Indus. Comm'n*, 134 Ariz. 597, 599 (App. 1982). An ALJ assesses the weight of the evidence and determines which of the conflicting testimony is more probably correct. *Perry,* 112 Ariz. at 398. As such, the ALJ is the sole judge of witnesses' credibility, meaning that the ALJ may reject any testimony, including the claimant's, if it is self-contradictory, inconsistent with other evidence, or directly impeached. *Holding v. Indus. Comm'n,* 139 Ariz. 548, 551 (App. 1984). Here, the ALJ could properly decide how to interpret Verdugo's testimony about his lack of shoulder pain prior to the injury as well as the fact that nothing in his prior medical records revealed shoulder problems. In fact, both Dr. Lederman and Dr. Steingart at two different hearings described how a pre-existing torn rotator cuff could have been asymptomatic prior to Verdugo's injury. Reasonable evidence supports the ALJ's decision to deny supportive medical care benefits. *See Ortega v. Indus. Comm'n*, 121 Ariz. 554, 557 (App. 1979).

## B. Loss of Earning Capacity

¶20 "Because an injured worker must seek to mitigate his damages, a claimant has an affirmative burden to establish his inability to return to date-of-injury employment and to make a good-faith effort to obtain other suitable employment or to present testimony from a labor

market expert to establish his residual earning capacity." *Kelly Servs. v. Indus. Comm'n*, 210 Ariz. 16, 18, ¶ 8 (App. 2005). If the worker meets this initial burden of proof, the employer or carrier must then "go forward with evidence demonstrating the availability of suitable employment and/or the lack of a causal relationship between the claimed loss of earning capacity and the injury." *Landon v. Indus. Comm'n,* 240 Ariz. 21, 27, ¶ 18 (App. 2016).

¶21 Verdugo, age 67 at the time of the injury, had worked for PUHSD since 2006. He is right-handed, graduated from high school and, in addition to being able to read and write English, is fluent in Spanish. He served in the military and has a service-related disability for insulin-dependent diabetes because of exposure to Agent Orange.

¶22 A conflict in the medical evidence existed as to whether Verdugo's left shoulder injury required work restrictions.[2] Dr. Steingart testified that Verdugo "certainly cannot go back to being a custodian, unless . . . given major modifications about lifting less than 10 pounds," and recommended no reaching, overhead activity, grasping, climbing ladders, or repetitive movement. Dr. Lederman testified that he found "no reason that based on the shoulder [Verdugo] should not be capable of doing the same level of work he was doing" before the injury, and opined that no restrictions were needed.

¶23 Both labor-market consultants testified regarding the physical requirements of particular employment and the education or training necessary, as well as the availability of positions. They conflicted, however, on the types of jobs suitable for Verdugo.

¶24 Gretchen Bakkenson, on Verdugo's behalf, testified that based on the restrictions outlined by Dr. Steingart, Verdugo would be unable to returned to his date-of-injury employment as a custodian. Assuming Dr. Steingart's restrictions, Verdugo would also be unable to return to unskilled work, which requires individuals to use their upper extremities frequently to continuously. Bakkenson further testified that part-time employment as a parking lot cashier would be best, but she noted that would be problematic because he would need to use his left arm and shoulder to reach out to vehicles. On cross-examination, she acknowledged

---

[2] Dr. Steingart testified that Verdugo had no impairment due to the left elbow injury and the resulting surgery did not restrict his ability to work.

that if the ALJ adopted Dr. Lederman's opinion, the jobs listed in Mark Kelman's report would be suitable and reasonably available.

¶25        Kelman, the Respondents' labor-market consultant, opined that, assuming Dr. Lederman's opinion were adopted, Verdugo could return to his former work at PUHSD and therefore not have a loss of earning capacity. If work restrictions were adopted, Kelman opined that Verdugo could work as a parking lot cashier. He disagreed with Bakkenson that Verdugo's left arm would prevent him from working in that job because a worker's dominant hand – right, in Verdugo's case – is the important physical factor.

¶26        The ALJ resolved the conflict in the medical evidence in favor of Dr. Lederman's opinion that no restrictions were needed, and adopted Kelman's opinion that assuming no work restrictions, Verdugo had no loss of earning capacity.

¶27        Verdugo contends that Bakkenson, to whom he paid $500, never testified. The record reflects, however, that she testified substantively on Verdugo's behalf and prepared a report submitted into evidence by his counsel. Verdugo also argues that many of the available jobs Kelman cited require two arms, but he cannot use his left arm. Verdugo's objection to Kelman's testimony goes to the weight the ALJ accorded it. As the trier of fact, the ALJ could properly weight the testimony of the labor-market consultants as deemed appropriate. *Le Duc v. Indus. Comm'n,* 116 Ariz. 95, 98 (App. 1977). And, as with the medical opinions, the ALJ was obligated to resolve all conflicts in the evidence and draw all warranted inferences. *See Malinski v. Indus. Comm'n,* 103 Ariz. 213, 217 (1968).

¶28        Finally, Verdugo's criticism of Kelman's assessment of available jobs is unavailing. Dr. Steingart opined that Verdugo needed work restrictions but he did not testify that those work restrictions included jobs that required Verdugo to use only one arm. Bakkenson based her opinion on work restrictions Dr. Steingart had outlined in his December 26, 2013 progress notes. Those restrictions included working at a "one-handed job" and carrying/lifting limits of five pounds. Dr. Steingart's testimony focused on less stringent work restrictions than he had previously outlined.

¶29        Given the conflicting medical evidence, as well as the conflicting testimony from the labor-market consultants, the ALJ's determination that Verdugo did not sustain a loss of earning capacity is not wholly unreasonable. We acknowledge that Verdugo's previously asymptomatic rotator cuff tear, which the industrial injury temporarily

aggravated, effectively means he may not be able to return to his pre-injury employment. Stated differently, Verdugo's temporary exacerbation of the rotator cuff tear undoubtedly caused certain work restrictions, but as the ALJ implicitly determined, those restrictions are not medically related to the industrial injury.

### C. Apportionment

¶30 We do not construe Verdugo's challenge to the award finding apportionment as contesting the technicalities or legitimacy of apportionment under A.R.S. § 23-1065 (C), but rather that he believes the ALJ attributed his shoulder problems to his diabetes. The pre-existing diabetes diagnosis, however, related to Verdugo's employability for application of the apportionment statute. The ALJ did not attribute his shoulder problems to diabetes.

¶31 The apportionment statute, A.R.S. § 23-1065, promotes the hiring and retention of disabled or handicapped workers. *Special Fund Div. v. Indus. Comm'n*, 224 Ariz. 29, 32, ¶ 10 (App. 2010). Section 23-1065 provides for reimbursement from the Fund for one-half the amount of compensation for loss of earning capacity or permanent total disability, *see* § 23–1065 (C)(4), when an employer has knowingly employed or retained a person with a qualifying impairment who later suffers an industrial injury. *Special Fund Div.*, 224 Ariz. at 31, ¶ 3; A.R.S. § 23-1065 (C) (listing diabetes among the "qualifying impairments").

¶32 In this case, the Fund stipulated that apportionment is appropriate. The evidence shows that the respondent carrier qualified for reimbursement under A.R.S. § 23-1065 (C) because, in part, Verdugo was diagnosed with diabetes prior to his industrial injury; PUHSD knew about the condition prior to his injury, as he discussed it with his supervisor; and Kelman, one of the labor-market consultants, concluded that Verdugo's diabetes constituted an obstacle or hindrance to employment for purposes of apportionment.

¶33 Moreover, Verdugo lacks standing to contest apportionment. Apportionment is a matter between the employer's carrier and the Fund. *See Schuff Steel Co. v. Indus. Comm'n*, 181 Ariz. 435, 437 n.1 (App. 1994) (noting that although claimant was a party to the special action, he had not actively participated in it "because the apportionment dispute is between the employer's carrier and the Special Fund Division); *Madrid v. Indus. Comm'n*, 178 Ariz. 606, 610 (App. 1994) (concluding that claimant had no standing to question how the compensation is paid and that "the only party

aggrieved by the apportionment is the Fund, which has acquiesced in the current award apportioning claimant's disability compensation in part to the Fund.").[3]

## CONCLUSION

¶34 Because we find that the evidence of record reasonably supports the ALJ's award and decision upon review, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[3] Verdugo also asserts that the Veterans' Administration should not be obligated to pay for his care when he was injured on the job, that the workers' compensation system treated him unfairly and is prejudiced against him, and that his lawyer, who terminated representation after the ALJ issued the December 2, 2015 decision, "worked for ICA, not his client." Verdugo has waived these issues because he does not develop any of them nor point to any evidence in the record that addresses them. *Polanco v. Indus. Comm'n,* 214 Ariz. 489, 491 n.2 (App. 2007) (holding that appellant's failure to develop and support argument waives issue on appeal). Waiver aside, the record does not support his assertions.